UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

---

MARTIN J. WALSH, Secretary of Labor, United States Department of Labor,

          Plaintiff,

v.

COMMUNITY HEALTH CENTER OF RICHMOND, INC., a corporation and HENRY THOMPSON, individually and as corporate officer,

          Defendants.

Civil Action No. 1:21-cv-03094

---

# COMPLAINT

Plaintiff, Martin J. Walsh, Secretary of Labor, United States Department of Labor (the "Secretary"), brings this action for an order for all appropriate relief pursuant to the provisions of section 11(c) of the Occupational Safety and Health Act of 1970, as amended, ("the Act"), 29 U.S.C. 651 *et seq.*, seeking to enforce the provisions of section 11(c) of the Act, 29 U.S.C. § 660(c).

Defendants Community Health Center of Richmond, Inc., ("CHCR") and its Chief Executive Officer, Henry Thompson, violated section 11(c) of the Act when they suspended, and ultimately terminated employee Qiana Nuñez ("Complainant") because she engaged in protected activity related to potential exposure to the SARS-CoV-2 virus ("COVID-19"). In particular, Complainant was suspended and then terminated because she reported a hazardous work condition to Defendants—the potential exposure to COVID-19 at an in-person staff meeting—and subsequent refusal to attend the in-person staff meeting due to her reasonable apprehension that attendance at the meeting could lead to contraction of COVD-19 and the range of serious injury or death associated with contraction of COVID-19.

## JURISDICTION AND VENUE

1. The Secretary brings this action pursuant to the authority granted to him by section 11(c)(2) of the Act, 29 U.S.C. § 660(c)(2).

2. This Court has jurisdiction over this action pursuant to section 11(c)(2) of the Act, 29 U.S.C. § 660(c)(2).

3. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 29 U.S.C. § 660(c)(2) and 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this claim occurred within the judicial district.

## DEFENDANT AND INTERESTED PARTY

4. Defendant CHCR is a not-for-profit corporation organized under the laws of the State of New York and at all times material has been an employer that provides services to individuals in New York City.

5. Defendant CHCR maintains its principal location for the regular transaction of business at 439 Port Richmond Avenue, Staten Island, New York 10302.

6. Defendant CHCR is now and has been at all times material, a "person" as defined in section 3(4) of the Act, 29 U.S.C. § 652(4).

7. Defendant CHCR is now and at all times material has been an "employer" engaged in a business affecting commerce within the meaning of section 3(5) of the Act, 29 U.S.C. § 652(5).

8. Defendant Henry Thompson, who regularly does business at 439 Port Richmond Avenue, Staten Island, Island New York 10302, is now and at all times material has been the Chief Executive Officer of Defendant CHCR with, among other things, the authority to hire, fire and to take disciplinary actions against employees of Defendant CHCR.

9. Defendant Henry Thompson is now and been at all times material, a "person" as defined in section 3(4) of the Act, 29 U.S.C. § 652(4).

10. Complainant Qiana Nunez worked as an Executive Office Manager for Defendant CHCR primarily performing services for or behalf of Defendant Henry Thompson before Defendants terminated her from her employment on April 3, 2020, in the midst of the COVID-19 pandemic. Ms. Nuñez suffers from epilepsy, Graves' disease, high blood pressure, and heart conditions.

11. Up until the time that Defendants terminated her, Ms. Nuñez was an employee who was employed by an employer as defined by sections 3(5) and 3(6) of the Act, 29 U.S.C. §§ 652(5)-(6).

## FACTUAL ALLEGATIONS

*CHCR's business and Ms. Nuñez's responsibilities*

12. CHCR operates three health centers in Staten Island, New York providing medical and dental care to its patients.

13. One of CHCR's health centers is located at 235 Port Richmond Avenue on Staten Island.

14. The 235 Port Richmond Avenue medical facility location ("Medical Facility") alone sees between 150 to 220 patients each day on average.

15. Defendant Thompson has served as CHCR's CEO since November 2009.

16. Defendant Thompson hired Ms. Nuñez as Executive Office Manager at CHCR's administrative offices at 439 Port Richmond Avenue ("Administrative Offices") to begin work on May 5, 2014.

17. Initially, Ms. Nuñez earned a starting salary of $50,000 from CHCR.

18. Since her hire, Ms. Nuñez reported directly to Defendant Thompson, who served as her direct supervisor.

19. In her position as Executive Office Manager, Ms. Nuñez was expected to work independently to maintain and manage Defendant Thompson's meeting schedules, calendar, itinerary and day-to-day activities of administration.

20. Among Ms. Nuñez's responsibilities was the scheduling of monthly executive leadership meetings, which were held in a conference room in the Administrative Offices.

21. The executive leadership meetings frequently lasted 1.5 hours or more.

22. Ms. Nuñez held her position as Executive Office Manager from May 5, 2014 until Defendants fired her on April 3, 2020.

23. Ms. Nuñez received regular pay raises during her employment with CHCR and was earning a $62,000 salary at the time of her termination.

*The Outbreak of the COVID-19 Pandemic*

24. On January 21, 2020, the Centers for Disease Control and Prevention announced the first known case of COVID-19 in the United States.

25. On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a public health emergency of international concern, which is WHO's highest level of alarm.

26. The next day, on January 31, 2020, the United States Department of Health and Human Services declared a public health emergency covering the entire United States.

27. On March 1, 2020, New York City recorded its first confirmed case of COVID-19.

28. New York State Governor Andrew Cuomo declared a Disaster Emergency in the State of New York just three days later on March 7, 2020.

29. The WHO declared the COVID-19 outbreak a pandemic on March 11, 2020.

30. On March 13, 2020, the President formally declared the pandemic a national emergency.

31. On March 13, 2020, the mayor of the City of New York issued a State of Emergency.

32. On March 16, 2020, Governor Cuomo issued an executive order, which among other things, directed state government to allow non-essential personnel to work from home and restricted non-essential state government workers from going into work.

*Ms. Nuñez reports unsafe conditions and refuses to attend a face-to-face meeting.*

33. CHCR had a monthly executive leadership meeting scheduled for March 17, 2020 at 12:30 pm ("the meeting").

34. The scheduled meeting was to be held in-person in a second-floor conference room at the Administrative Offices ("the conference room)."

35. The meeting was to include 10-12 in-person attendees, including members of CHCR's clinical staff who provided direct services to CHCR's patients.

36. The conference room's dimensions are approximately 13 feet, 6 inches wide by 18 feet long.

37. The conference room has no windows to the outside of the building.

38. The conference room has only one air supply vent.

39. Attendees of the executive leadership meetings sit at a table that is 4 feet wide and 12 feet long.

40. Face coverings were not provided for the meeting and attendees did not wear any.

41. The conference room was also used for storage further constricting the space where individuals could sit and further limiting the ability to social distance.

42. Prior to coming into work on March 17, 2020, Ms. Nuñez had, among other things, heard about Governor Cuomo's March 16 executive order on COVID-19 directing non-essential government employees to stay home.

43. Knowing that there was an in-person executive leadership meeting planned for March 17, Ms. Nuñez was concerned that she and her colleagues could be exposed to COVID-19 at the meeting.

44. Ms. Nuñez was concerned that COVID-19 could have a particularly serious impact on her health and safety because or her preexisting conditions.

45. Ms. Nuñez reasonably believed exposure to COVID-19 could lead to death or other serious injury.

46. At or about 9:24 am on March 17, 2020, Ms. Nuñez sent a text message to Defendant Thompson stating: "Good Morning. Are we canceling the leadership meeting or holding it via conference call?"

47. By 10:02 am, Ms. Nuñez had not received a response from Defendant Thompson to the question posed in her text.

48. At or about 10:02 am, with the in-person meeting less than 2.5 hours away, Ms. Nuñez sent a follow-up email to Defendant Thompson stating she would set the meeting as a conference call.

49. There was insufficient time to have OSHA conduct an inspection.

50. Ms. Nuñez subsequently sent an email to the executive leadership meeting's attendees stating the meeting would be held by teleconference rather than in-person.

51. Soon after Ms. Nuñez rescheduled the meeting to a teleconference, Defendant Thompson called Ms. Nuñez to tell her to re-set the meeting as an in-person meeting (the "telephone call").

52. Per Defendant Thompson's instructions on the telephone call, Ms. Nuñez re-set the executive leadership meeting as an in-person meeting. She followed up with individual meeting participants to confirm the in-person nature of the meeting.

53. Ms. Nuñez told Defendant Thompson she was concerned about attending the in-person executive leadership meeting given the ongoing COVID-19 pandemic.

54. Ms. Nunez told Defendant Thompson she believed the conference room was poorly ventilated and that there was no space for appropriate social distancing.

55. Ms. Nuñez also told Defendant Thompson she felt it was particularly unsafe to hold the in-person meeting given that members of the clinical staff would be in attendance.

56. Defendant Thompson understood Ms. Nuñez was concerned about transmission of COVID-19 at the in-person executive leadership meeting.

57. Ms. Nuñez told Defendant Thompson she did not want to attend the meeting in-person due to the risk of COVID-19 transmission.

58. Ms. Nuñez did not attend the meeting due to her reasonable concern for contracting COVID-19 at the meeting.

59. Defendant Thompson did not provide Ms. Nuñez alternative work she could perform instead of attending the in-person meeting and did not tell her to call into the meeting.

60. During the executive leadership meeting Ms. Nunez performed other work-related tasks at her desk.

*Defendants' Abrupt and Unlawful Retaliation against Ms. Nuñez*

61. On March 19, 2020, two days after the executive leadership meeting, Ms. Nuñez was called into Senior Director of Finance and Benefit Administration Williar Hodges's Office where Ms. Hodges told her she was suspended and handed Ms. Nuñez a letter further informing her that she was suspended.

62. This suspension letter stated Ms. Nuñez was suspended as of March 19, 2020 for alleged "insubordination, confrontational and disruptive behavior, and refusal to participate in the Community Health Center of Richmond's (CHCR) leadership team meeting on Tuesday, March 17, 2020[.]"

63. Defendant Thompson made the decision to suspend Ms. Nuñez.

64. At no time during the telephone call or prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez she was being disrespectful.

65. At no time during the telephone call or prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez she was being insubordinate.

66. At no time during the telephone call or prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez she was being confrontational.

67. At no time during the telephone call and prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez she was being abrasive.

68. At no time during the telephone call or prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez she was being unprofessional.

69. At no time during the telephone call or prior to the meeting with Ms. Hodges did Defendant Thompson or any other representative of Defendants tell Ms. Nuñez her behavior was disruptive.

70. Other than during the one telephone call, Defendant Thompson and Ms. Nuñez did not discuss the March 17, 2020 executive leadership meeting again.

71. On or about April 9, 2020, Ms. Nuñez received a letter by mail, dated April 9, 2020, informing her that Defendants terminated her effective April 3, 2020.

72. The April 9, 2020 termination letter provided no reason as to why Defendants terminated Ms. Nuñez other than a statement that CHCR was "exercising our employer right to terminate your at-will employment[.]"

73. Defendant Thompson made the decision to terminate Ms. Nuñez.

74. At no point prior to the March 19, 2020 suspension did Defendants ever take disciplinary action against Ms. Nuñez.

### *Ms. Nuñez Files a Complaint with OSHA*

75. On or about May 7, 2020, Ms. Nuñez timely filed a complaint with the Occupational Safety and Health Administration ("OSHA") under section 11(c)(2) of the Act, 29 U.S.C. § 660(c)(2), alleging that Defendants suspended and then terminated her for making a good faith health and safety complaint regarding unsafe conditions at the March 17, 2020 executive leadership meeting related to potential COVID-19 exposure, and her associated refusal to attend the meeting in-person.

76. OSHA investigated Ms. Nuñez's complaint and determined that Defendants violated Section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1) when it suspended and then terminated Ms. Nuñez because she engaged in the protected activities of making a good faith health and safety complaint to Defendants Thompson and CHCR and for refusing to attend the in-person meeting.

## DEFENDANTS' VIOLATIONS OF THE ACT

77. The Secretary incorporates by reference paragraphs 1 through 76 of this Complaint as if fully set forth herein.

78. The activities described in paragraphs 43 and 53-56 constitute the filing of a complaint under the Act and the exercise of rights protected by the Act.

79. The activities described in paragraphs 43-60 constitute a justified work refusal, which is a separate exercise of a right protected by the Act.

80. Defendants suspended Ms. Nuñez because she exercised rights and engaged in activities protected by the Act, in violation of section 11(c) of the Act, 29 U.S.C. § 660(c)(1).

81. Defendants terminated Ms. Nuñez because she exercised rights and engaged in activities protected by the Act, in violation of section 11(c) of the Act, 29 U.S.C. § 660(c)(1).

82. To date, Defendants have failed to reinstate Ms. Nuñez and to compensate her for lost wages and other damages suffered as a result of the company's unlawful actions, in continued violation of section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1).

## RELIEF SOUGHT

By the acts described in paragraphs 33 through 82, Defendants discharged or discriminated against Ms. Nuñez, because of her exercise of rights under, or related to, the Act. Defendant did engage in conduct in violation of Section 11(c) of the Act, 29 U.S.C. § 660(c).

WHEREFORE, cause having been shown, Plaintiff prays for judgment:

(a) Permanently enjoining and restraining Defendants, their officers, agents, servants, employees and those persons in active concert or participation with them, from violating the provisions of section 11(c)(1) of the Act, 29 U.S.C. § 660(c);

(b) Ordering Defendants to pay damages to Ms. Nuñez for all past and future lost wages and benefits that resulted from her termination, and prejudgment and post-judgment interest thereon, as authorized by section 11(c) of the Act;

(c) Ordering Defendants to provide appropriate front pay (also known as economic reinstatement) to Ms. Nuñez, in lieu of reinstatement to her previous position;

(d) Ordering Defendants to expunge from all personnel and company records references to the circumstances giving rise to Defendants' unlawful suspension and termination of Ms. Nuñez;

(e) Ordering Defendants to provide compensation to reimburse Ms. Nuñez for any costs, expenses, and/or other pecuniary losses she incurred as a result of Defendants' unlawful discriminatory actions;

(f) Ordering Defendants to provide compensation for non-pecuniary losses, including emotional pain and distress;

(g) Ordering Defendants to pay additional compensation to Complainant as exemplary or punitive damages in an amount to be determined at trial;

(h) Ordering the posting of a notice for employees stating that Defendants will not in any manner discriminate against any employee for engaging in activities protected by Section 11(c) of the Act, 29 U.S.C. § 660(c);

(i) Awarding Plaintiff for all costs incurred in this action; and

  (j)  Ordering such and further relief as may be necessary and appropriate.


DATED:  June 1, 2021
      New York, New York

                ELENA S. GOLDSTEIN
                Acting Solicitor of Labor

                JEFFREY S. ROGOFF
                Regional Solicitor

                <u>s/David J. Rutenberg</u>
                DAVID J. RUTENBERG
                Trial Attorney

                U.S. Department of Labor
                Office of the Solicitor
                201 Varick Street, Room 983
                New York, NY 10014
                Tel: 646.264.3686
                Fax: 646.264.3660
                Rutenberg.david.j@dol.gov
                NY-SOL-ECF@dol.gov

                Attorneys for Plaintiff

Case 1:21-cv-03094-ARR-TAM   Document 1   Filed 06/01/21   Page 13 of 13 PageID #: 13

Certificate of Service

I certify that on June 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and further certify that I have e-mailed the foregoing to:

>David I. Rosen
>Sills Cummis & Gross P.C.
>One Riverfront Plaza
>Newark, NJ 07102
>drosen@sillscummis.com

<br>

s/David J. Rutenberg
David J. Rutenberg